# Exhibit A

STATE OF RHODE ISLAND
EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES
APPEALS OFFICE

JOSHUA MELLO

V.                                                                    DOCKET No. Y24-80

DEPARTMENT OF CHILDREN,
YOUTH AND FAMILIES

## DECISION

### I. INTRODUCTION

An in-person hearing on the above-entitled matter was held October 21, 2024. Joshua Mello (Petitioner) initiated this matter to appeal the May 7, 2024, indication of Physical Abuse - Excessive/Inappropriate Discipline regarding Karissa M. Mello (the child) from the Department of Children, Youth and Families (DCYF). The indication arose out of investigation #511064 in case #20194518. The Petitioner is seeking to have the indicated findings reversed to unfounded. For the reasons discussed in more details below, the Petitioner's appeal is granted.

### II. JURISDICTION

The Executive Office of Health and Human Services (EOHHS) is authorized and designated by R.I.G.L. § 42-7.2-6.1 and EOHHS regulation 210-RICR-10-05-2 to be the entity responsible for appeals and hearings related to DCYF Child Protective Services Investigations. The administrative hearing was held in accordance with the Administrative Procedures Act, R.I.G.L. § 42-35-1 et. seq., and EOHHS regulation 210-RICR-10-05-2.

### III. ISSUE

The issue before this Appeals Officer is whether the indicated finding of Physical Abuse – Excessive/Inappropriate Discipline against the Petitioner is supported by a preponderance of the evidence in accordance with DCYF policy as set forth below.

### IV. STANDARD OF PROOF

DCYF has the burden of proving the allegations it brings against the parent(s)/caretaker(s) in all administrative hearings relating to child abuse and neglect. The standard of proof to indicate a report of child abuse or neglect is a "preponderance of the evidence." This is defined as evidence of a greater weight or more convincing than the evidence in opposition to it. The evidence must show that the fact sought to be proved is more probable than not. (The Formal Hearing - Procedure from DCYF DOP 500.0050(II)(A). The investigator must continually weigh the reliability of and ascribe importance to each piece of information received during the investigative process. This includes assessing the credibility of the statements of individuals interviewed during the investigation. (DCYF DOP 500.0050(II)(A)(1) and (2)).

### V. PARTIES AND EXHIBITS

Present for DCYF was Child Protective Services Investigator Laura Bailey (CPI Bailey) who provided testimony regarding the case. The Petitioner testified and presented evidence; his spouse Rachel Ware and friend Tim Schreib also testified. The following exhibits were presented as evidence:

- DCYF Exhibits:
    - Exhibit #1: DCYF Department Operating Procedure: Criteria for a Child Protective Services Investigation
    - Exhibit #2: Notification of Child Protective Services Investigation Findings, May 7, 2024
    - Exhibit #3: Family Functioning Assessment (FFA), May 7, 2024
    - Exhibit #4: Aubin Report of Examination/progress notes, dated April 24, 2024

- - o   Exhibit #5: Video recording of the incident
    - o   Exhibit #6: Cranston Police Department Incident Report, dated April 24, 2024
- Petitioner Exhibits:
    - o   Exhibit #1: Appeal letter, Family Court Dismissal Order regarding complaint for protection of abuse
    - o   Exhibit #2: Bodycam footage from Cranston police
    - o   Exhibit #3: Statement and attached documents from Dr. Sandra Speer
    - o   Exhibit #4: Statement from Kenneth Filarski, Esq.
    - o   Exhibit #5: Cranston police video
    - o   Exhihit #6: Deposition, Tonya Morena, September 13, 2024
    - o   Exhibit #7: Petitioner letter
    - o   Exhibit #8: Timeline of events

## VI.   RELEVANT LAW/REGULATIONS

DCYF investigates reports of alleged child abuse and/or neglect when there is reasonable cause to believe the abuse or neglect exists. (DCYF DOP 500.0025(II)(A)). Each indication has its own set of elements needed to be met in order to be indicated for that offense.

According to the DOP, Physical Abuse – Excessive/ Inappropriate Discipline is defined as an action taken by a caregiver in which the following conditions or factors are present:

a.  The discipline is the result of an action or inaction by the child;

b.  The intensity of the caregiver's reaction does not correspond with the seriousness (or lack) of the child's action/inaction;

c.  The discipline administered is inappropriate or not in the child's best interest based upon the child's level of functioning;

d.  It is apparent that the caregiver did not control his/her reaction by stopping the punishment. One of the following is also present:

      i.     Bodily injury;

      ii.    Undue emotional stress on the child.

e. To indicate this allegation a medical professional, a behavioral health professional, a law enforcement officer or child protective investigator is the source of the diagnosis or verification.

## VII. FINDINGS OF FACT

1. An investigation commenced after the RI Child Abuse Hotline received a report on April 22, 2024, from Cranston Police about concerns for a 14-year-old juvenile female because her father – the Petitioner – showed up at her bus stop and, according to the Police, a video showed him being rough with her.

2. The Petitioner was indicated by DCYF for Excessive/Inappropriate Discipline on May 7, 2024, regarding his 14-year-old daughter in connection with the April 22, 2024, incident.

3. The spouse testified that the Petitioner was called by the school on March 13, 2024, about the child being on the phone at school and the Petitioner contacted his child that day, reprimanded her over the phone, and told her he wanted to see her phone. That was when the child cut off communication, the spouse testified (Petitioner Exhibit #8).

4. The Petitioner testified he went to the bus stop with his spouse because it had been 40 days since he talked to his child and that she had been avoiding him and not responding to phone calls.

5. The Petitioner and his child's mother share joint custody; the Petitioner did not have set times to see his child.

6. The spouse testified that prior to the 40-day period of no contact, they would pick up the child at the bus stop, usually on Tuesdays.

7. The Petitioner and spouse testified that the woman who showed up during the incident (the mother's friend) had no authority to be there.

8. According to the FFA and CPI Bailey's testimony:

   a. The child was interviewed by CPI Bailey alone two days after the incident, and she told the CPI she cut off communication with her father, saying he is controlling with her life. She said she would go with him on Tuesdays for therapy sessions, but that ended when the father argued with the therapist and scared her, so the therapist refused to continue to treat the child because of the Petitioner's behavior.

   b. The child saw the Petitioner standing and waiting for her when she exited the bus, and tried to walk past him when he grabbed her. The child discussed a previous incident when the Petitioner grabbed her walking home from school and put her in his car, took her cell phone so she could not contact her mother and police, and took her to his storage unit for hours. It was later explained that the father and his spouse did not have permanent housing at the time, so the storage unit appeared to be the most comfortable place for the Petitioner to visit with his child.

   c. The child denied any previous physical discipline by her father, claiming that he gets really upset when she ignores him and cuts him off.

   d. The child showed the CPI an abrasion and scratch on her left arm; she claimed it could have been caused by the altercation on Monday, but was not sure how.

   e. The mother told CPI Bailey that the Petitioner is controlling, and this is usual behavior that he displays when his child cuts him off.

   f. The Petitioner was angry and hostile when CPI Bailey advised him of the allegations, and told her he has rights to his child, and when she refuses to see or speak to him for 40 days, he, as a parent, can discipline her for her actions.

   g. The Petitioner told CPI Bailey that his child dropped herself to the ground, and that he was attempting to prevent her from hurting herself when she was flailing; he was aware of the videos of the incident.

    h. CPI Bailey was informed on April 28, 2024, that the Petitioner was arrested for second degree child abuse and disorderly conduct; a no contact order was issued against him regarding his child and her mother.

    i. CPI Bailey testified that other children witnessed the bus incident and videotaped it, causing emotional harm to the child.

9. The video shows the Petitioner with his arms around the child and the child struggling to get out of his grasp; he can be heard saying "this is my daughter," "let's go" and "enough;" together they struggle on the sidewalk, and the child screams; eventually he lets go and the child sits on the wall, and they start talking and gesturing. When the mother's friend shows up, the situation escalates again when the child attempts to go toward her; the Petitioner again puts his arms around the child to hold her as the mother's friend approaches and the Petitioner and mother's friend swear at each other. The spouse is seen trying to push the mother's friend away from the child.

10. The Cranston Police Incident Report states the child was crying hysterically after the incident and did not want to be with the Petitioner, and wanted to stay in her mother's friend's car.

11. The Petitioner testified that he feels his child is being alienated from him by her mother.

12. The child was evaluated at the Aubin Center two days after the incident, April 24, 2024, because she felt "very sore;" a cluster of abrasions on her left lower arm with an adjacent bruise and a bruise on her right thigh were noted.

13. Although the Aubin Center recommended no future contact between the child and the Petitioner based in part on their relationship history, the information obtained by the Aubin Center is insufficient to determine specifically whether the alleged abuse that occurred on April 22, 2024, was due to the Petitioner.

14. According to the videotaped interview with the child at the Police Station, on April 24, 2024, (Petitioner Exhibit #5), the child described her relationship with the Petitioner as "on and off." She said she would see him at least once a week to go out to eat or visit with him at his

storage unit. She said the last message from him was March 21, 2024. On March 25, 2024, he called her and also went to her house with a bullhorn trying to get her attention. She said something happened at school and her "father threw a big fit" and wanted to go through her phone. Before the bus incident, she said she hadn't seen him for a month or so.

15. The child's mother told police that she advised her child to scream at the top of her lungs if she needed help regarding her father because that would be the only way someone would help her.

16. The child told police she cut off contact with the Petitioner for a period in 2023 because he told her she would be able to live with him once he receives money from the lawsuits he has against the city of Cranston and the School Department. She said she doesn't want to live with him so she cut off contact, and that lasted from around spring 2023 until the beginning of the school year in September 2023 when he showed up at the bus stop, grabbed her phone and pushed her to his car and brought her to the storage unit for almost five hours; she said she was petrified. She said if she doesn't answer her father's calls/texts immediately, he "throws a fit."

17. The spouse testified she never saw the child act the way she did at the bus stop before. It appears that the child's unusual reaction to her father's presence at the bus stop escalated the interaction.

18. The child's phone was taken by the spouse during the bus incident, the mother and child told police.

19. The Petitioner and spouse testified that the child's phone use has been a constant issue and she had been caught before with sexually explicit images/content on it.

20. In the police video, the child's mother said the first thing the Petitioner does when he sees his child is take her phone.

## VIII. DISCUSSION

The parents of the child have joint custody, but it clearly was not being followed, even though there were no set times for the Petitioner to see his child. It is clear that the Petitioner was frustrated by the lack of contact with his child and that is what prompted him and his wife to go to the bus stop to find her after he had been cut off from her for more than a month. It is undisputed that there was a concerning incident at school involving the child and her phone. It appears that the Petitioner felt strongly that he needed to address the issue with the child because the school contacted him about the phone use.

The Petitioner testified about the previous close relationship he had with his child and how she would contact him during the day when she was at school for anything she needed because her mother was working. He said they would also go out to eat together and she would call him to pick her up from places.

It is unclear why the relationship between the Petitioner and child changed, other than perhaps she did not want any scrutiny over her phone use.

Based on all of the evidence and testimony, and despite the fact that the Petitioner's actions that day were not an example of good parenting, they do not rise to the level of physical abuse. He was not hitting her, but trying to talk with her and grabbed her backpack when she wasn't responding to him to get her attention. Though she was struggling to get away from him, and began flailing, the struggle stopped when she ended up sitting on the stone wall, and then the incident escalated again when the mother's friend arrived on the scene. It is unclear if the marks on the child were from her falling to the ground, from her father or the mother's friend, or from another incident entirely. As to the allegation of emotional harm, it is hard to gauge the true effect on the child as she did not seem to be overly upset about the incident during her interview later with police. It is true that students on the bus took video of the incident but the effect of the videotaping on the child is not clear. Therefore, there is not a preponderance of evidence to support the indication of Physical Abuse - Excessive/Inappropriate Discipline.

## IX. CONCLUSION OF LAW

After careful review of the testimony and evidence presented at the Administrative Hearing, this Appeals Officer concludes:

1. The Petitioner was not trying to hurt his child, but talk with her.
2. Any marks on the child cannot be proven to be made by the Petitioner.
3. Emotional harm cannot be determined based on the evidence submitted.

## X. DECISION

Based on the foregoing Findings of Fact, Conclusions of Law, evidence, and testimony it is found that a final order be entered that there is not sufficient evidence to support the DCYF indication of Physical Abuse/Excessive Inappropriate Discipline.

**APPEAL GRANTED**

/s/ Lori Stabile

Lori Stabile

Appeals Officer

## NOTICE OF APPELLATE RIGHTS

STATE OF RHODE ISLAND
DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES

NOTICE OF AVAILABILITY OF JUDICIAL REVIEW
(PROVIDED PURSUANT TO R.I.G.L. § 42-35-12)

Please be advised that if you are aggrieved by this final decision of the Rhode Island Department of Children, Youth and Families ("Department") you may seek judicial review of the Department's final decision by filing an appeal with the Rhode Island Family Court on matters affecting or concerning children under the age of eighteen (18) years pursuant to R.I.G.L. § 8-10-3 or to the Rhode Island Superior Court on all other administrative matters pursuant to R.I.G.L. § 42-35-15. You have <u>thirty (30) days</u> from the mailing date (or hand delivery date) of the Department's final decision to file your appeal. The procedures for filing the appeal are set forth in R.I.G.L. § 42-35-15 (a) through (g).

Proceedings for review may be instituted by filing a complaint in the Family Court in Providence County on all matters affecting or concerning children under the age of eighteen (18) years. On all other matters, proceedings for review may be instituted in the Superior Court of Providence County or in the Superior Court of the county in which the action arose. Copies of the complaint must be served upon the Department and all other parties of record in your case. You must serve copies of the complaint within ten (10) days after your complaint is filed with the Family Court or the Superior Court.

Please be advised that the filing of a complaint (appeal) with the Family Court or the Superior Court does not itself stay enforcement of the Department's final decision. You may however seek a stay from the Department and/or from the Court.

The judicial review shall be conducted by the Family Court or the Superior Court without a jury and shall be confined to the record. The Court, upon request, shall hear oral arguments and receive written briefs.

## CERTIFICATION

I hereby certify that I mailed, via regular mail, postage prepaid, a true copy of the foregoing to Joshua Mello and Rachel Ware, 57 Rolfe Square, Unit 10113, Cranston, Rhode Island, 02910; copies were sent, via email, to Joshua Mello at kskustomsrideons@gmail.com, and DCYF representatives Domenic Lancellotta, Deborah Palumbo, Angelica DiMaio, and Laura Bailey, on this 17th day of January, 2025.

_Marilyn E Jacobs_